The Full Commission has reviewed the prior Opinion and Award based on the record of the proceedings before Deputy Commissioner George T. Glenn, II, and the briefs and oral arguments on appeal. The appealing party has not shown good ground to reconsider the evidence, receive further evidence or modify the holding of the prior Opinion and Award, the prior result being proper. The Full Commission has, however, rewritten the Opinion and Award as follows.
***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing on 19 October 1994 through a Pre-Trial Agreement as:
STIPULATIONS
1. The parties are properly before the Industrial Commission which has jurisdiction of the parties and the subject matter.
2. All parties are subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
3. An employer-employee relationship existed between plaintiff John Hutchens and defendant Southern Bell, prior to and on November 15, 1989.
4. Defendant is a duly qualified self-insured employer.
5. Plaintiff's average weekly wage for the year immediately preceding November 15, 1989 was $641.50, producing a compensation rate of $376.00.
6. Plaintiff sustained a compensable injury on 15 November 1989.
***********
Based on the evidence of record, the Full Commission makes the following:
FINDINGS OF FACT
1. Plaintiff went to work for Southern Bell, then known as Western Electric, in 1966. His only break in employment with Southern Bell was during the two years he served in the Army (May 1966-May 1968). He was honorably discharged and immediately returned to work for Southern Bell. His seniority date is 21 June 1966.
2. Plaintiff sustained a compensable injury on 15 November 1989, due to the inhalation of chemicals at work. The parties entered into a Form 21 Agreement for this injury by accident, which was approved by the Industrial Commission on or about 21 August 1990. Thereafter, the parties entered into a series of Form 26 Agreements which were approved by the Industrial Commission. The Form 21 and Form 26 Agreements are incorporated herein by reference.
3. As a result of the form agreements and orders, plaintiff received 2 4/7ths weeks of temporary total disability benefits over a ten month period beginning 16 November 1989 and ending 5 September 1990. The temporary total disability was paid to Mr. Hutchens as a result of his intermittent disability due to his compensable exposure to chemicals, which rendered him disabled because of dizziness, swollen extremities, faintness, and headaches.
4. Subsequent to 5 September 1990, defendant refused to pay additional temporary total disability, even though plaintiff continued to intermittently miss work due to the same symptoms. On 4 February 1991 defendant filed an I.C. Form 28B, attempting to close the case.
5. On 4 September 1992, plaintiff filed an Application for Review, opposing defendant's refusal to pay additional benefits, and requesting that the Industrial Commission award benefits based on plaintiff's compensable injury resulting from chemical exposure. Defendant opposed plaintiff's request.
6. Plaintiff's original job title was as a Switchman. As the equipment changed his job title also changed. From approximately 1969 through 1986, he was a Switching Equipment Technician. His job responsibilities were to maintain and repair the mechanical switching equipment which allowed telephone lines to connect with one another.
7. In 1986, with the introduction of computers and electronic switching equipment, his title changed to Electronic Technician. He worked at the large Lexington Road facility. He was then assigned to the Glenn Avenue Central Office. For the last ten years, since May, 1986, he has worked at the Clemmons Central Office.
8. Throughout his employment with Southern Bell, plaintiff has been exposed to a variety of chemicals, used to degrease, dedust, and clean telephone switching equipment. These chemicals include trichloroethylene, perchloroethylene, trichloroethane, trichlorotrifluoroethane, dichlorodi-fluoromethane, and toluene.
9. From May 1968, until June 1969, plaintiff cleaned equipment by leaning over and submerging the equipment into a steaming vat of chemicals, which included trichloroethylene and perchloroethylene. He inhaled the fumes of trichloroethylene and perchloroethylene for approximately one year.
10. For the next 17 years (June 1969-May 1986), plaintiff worked as a Switching Equipment Technician, which resulted in daily exposure to trichloroethane, which was used in an aerosol spray can to clean switches. The trichloroethane spray would blow back on his face, arms and hands.
11. During the last few years of that period, plaintiff used the trichloroethane spray on a much more frequent basis because defendant was changing from mechanical switches to electronic switches. During the change over period, defendant was not replacing the faulty mechanical switches and more maintenance was needed to keep them operating. Plaintiff thus used the trichloroethane spray more and more often during the day.
12. On 14 November and 15 November 1989, plaintiff was performing his duties as an Electronic Technician, in the small, poorly ventilated room, which contained his work station and the switching equipment. At the same time, a technician from ATT was performing modifications to circuit packs which were causing outages, in order to prevent them from failing due to hygroscopic dust. The circuit packs were being cleaned, lubricated, and coated with MS-165, MS-181, and conformal coating, which contain trichloroethane, trichlorotrifluoroethane, dichlorodifluoromethane, and toluene.
13. Plaintiff was the only person working full time in the poorly ventilated room containing his work station and the switching equipment. When the newly coated circuit packs were returned to the switching equipment, the circuit packs would get hot and give off fumes and plaintiff would be exposed to these airborne fumes.
14. During the first day of his exposure, 14 November 1989, plaintiff noticed the fumes, but did not experience a physical reaction to the chemicals, other than nausea and left arm pain later that night.
15. On the second day of his exposure, plaintiff experienced swelling in his knees, numbness in his hands, swelling in his left wrist to the extent that it expanded and opened up the flexible watch band he was wearing, swelling in his right ankle, difficulty getting out of a chair, and nausea. Plaintiff reported his condition to his supervisor.
16. At the end of his second day of exposure, plaintiff was asked to perform some work at the Glenn Avenue Office. Driving from the Clemmons office to the Glenn Avenue Office, plaintiff experienced difficulty shifting the gears on his car. When he arrived at the Glenn Avenue Office, his knees hurt so bad that he could barely exit his car. Plaintiff completed his work and went home.
17. Upon arriving home he had to be assisted into the house by his wife. The next day, 6 November 1989, plaintiff was unable to go into work because he could not get out of bed due to the swelling in his knees. Plaintiff then missed a second day because of his condition and saw the company doctor on 17 November 1989.
18. Following a previously scheduled weeks vacation, plaintiff was able to return to work on 27 November 1989. During that week he attended a conference in Raleigh, where he twice experienced a reoccurrence of his chemical reaction symptoms, including swelling in the knees, soreness, and shortness of breath, even while sitting in a classroom.
19. As the result of his condition, over the next several months plaintiff was unable to work on numerous days and for short periods of time. These periods included:
11 December through 15 December 1989; 12 February 1989; 19 March 1989; 11 June 1989; 15 June 1989; 25 June through 29 June 1989; and, 4 September through 5 September 1990. Plaintiff received workers' compensation benefits for these short term effects of his admittedly compensable chemical exposure.
20. Additionally, plaintiff missed the following periods of work due to his condition, and for which he was not compensated pursuant to the Act: 6 November and 9 November 1990; 7 January through 12 January 1991; 25 April and 29 April through 30 April 1991; 27 June 1991; 8 July through 12 July 1991; 9 September 1991; 23 October 1991; 31 October through 1 November 1991; 12 November through 13 November 1991; 8 January through 10 January 1992; 13 January 1992; 26 February through 27 February 1992; 6 March 1992; 9 March through 13 March 1992; 6 April 1992; 10 July through 24 July 1992; and 27 July through 8 August 1992.
21. Shortly after his initial exposure, and as a result of his missing work, defendant sent plaintiff to John H. Gray III, M.D. for a physical examination. Based on the history of his chemical exposure, continued complaints of swelling and shortness of breath, and two ANA titer tests, Dr. Gray referred plaintiff to Dr. Metcalf, a rheumatologist to be tested for a possible audio immune disorder.
22. Dr. Douglas L. Metcalf is a Board Certified specialist in internal medicine and rheumatology. He has been plaintiff's treating physician since 15 May 1990. He has diagnosed plaintiff as suffering from Undifferentiated Connective Tissue Disease (UCTD). It is Dr. Metcalf's opinion to a reasonable degree of medical certainty and satisfactory to himself that plaintiff's condition, is causally related to the chemical exposure sustained by plaintiff at work on 14 November and 15 November 1989.
23. Dr. Metcalf's opinion is based on the historical sequence of plaintiff's disease, including his preexisting good health, his exposure to chemicals which have been linked to connective tissue diseases, his immediate and strong multiple reaction to the chemical exposure, followed immediately by his development of a debilitating and eventually life-threatening connective tissue disease.
24. Considering plaintiff's condition and his diagnosis, Dr. Metcalf has expressed surprise that plaintiff is still able to work and is of the opinion that he will not be able to work much longer. Plaintiff's connective tissue disease is scarring his lungs and reducing his ability to breathe. Plaintiff may soon need supplemental oxygen. As a result, plaintiff is being treated with an aggressive drug, methotrexate, normally used in the latter stages of treatment.
25. Plaintiff's physical condition is steadily deteriorating and, if nothing else becomes involved, his condition alone will result in his being disabled from work on a permanent basis in the future. His physicians have explained his continued ability to work as being attributable to plaintiff's determination. His daily activities are severely hampered by fatigue, as well as joint pain and swelling. His joint pain and swelling have increased. Plaintiff is experiencing skin tightness and hide bond skin over the hands and feet, and experiences significant pain when you do range of motion of his joints, especially the shoulders, hips and knees. Plaintiff's mixed connective tissue disease will continue to increase in its severity and will progressively adversely affect his ability to breathe. The deterioration of plaintiff's physical condition has occurred over a period of time, but this deterioration has affected and will continue to impair his ability to earn wages.
26. Edward Carwile LeRoy, M.D. has amassed over thirty years of experience with connective tissue diseases, and is a recognized expert in connective tissue diseases. He is the director of rheumatology and immunology at the Medical University of South Carolina. He has published in the area of environmental triggers causing scleroderma and served on a World Health Organization Commission which studied an epidemic of scleroderma like diseases in Spain caused by food-related toxic oil. It is Dr. LeRoy's opinion to a reasonable degree of medical certainty and satisfactory to himself that there is a causal connection between plaintiff's November 1989 compensable chemical exposure and his connective tissue disease. His opinion is based upon a review of plaintiff's medical records, his short term occupational exposure to trichloroethylene and perchloroethylene in 1968-69, his chronic low-level exposure to trichloroethane from 1969-86, and his two day symptomatic exposure to trichlorotrifluoroethane, dichlorodifluoromethane and toluene on 14 November and 15 November 1989.
27. Plaintiff's employment with defendant caused or significantly contributed to the development of his connective tissue disease. Additionally, plaintiff's employment exposed him to an increased risk of developing this disease.
28. Subsequent to defendant filing its Form 28B, and since defendant last payment of compensation benefits, plaintiff has sustained a substantial change of condition.
29. As the result of plaintiff's change of condition and occupational disease, he was unable to earn wages in his position with defendant or in any other employment for the following periods: 6 November and 9 November 1990; 7 January through 12 January 1991; 25 April and 29 April through 30 April 1991; 27 June 1991; 8 July through 12 July 1991; 9 September 1991; 23 October 1991; 31 October through 1 November 1991; 12 November through 13 November 1991; 8 January through 10 January 1992; 13 January 1992; 26 February through 27 February 1992; 6 March 1992; 9 March through 13 March 1992; 6 April 1992; 10 July through 24 July 1992; and 27 July through 8 August 1992. There is evidence in the record that this pattern of work and absences continued after 8 August 1992 through the date of this Opinion and Award.
31. Based on the record of evidence plaintiff retained sufficient physical strength to continue to work as of the date of oral arguments before the Full Commission. However, plaintiff's condition is steadily deteriorating. If no other causal factor becomes involved, it is more likely than not that in the future, plaintiff's condition result in his being unable to perform his job with defendant on a permanent basis.
*********
Based upon the foregoing findings of fact, the Full Commission concludes as follows:
CONCLUSION OF LAW
1. As the result of his employment with defendant, plaintiff has developed a connective tissue disease, which is an occupational disease under the provisions of the Act. G.S. §97-53(13).
2. As the result of his employment with defendant and occupational disease, plaintiff has sustained substantial change in condition, which affects his wage earning capacity. G.S. § 97-47.
3. Pursuant to a Form 21 Agreement, approved by the Commission on August 21, 1990, defendant admitted liability for plaintiff's 14 November and 15 November 1989 injury by accident, arising out of and in the course of his employment with defendant. Defendant agreed to pay plaintiff a period of disability for the "necessary" weeks. The parties in this case identified a specific incident and agreed that plaintiff sustained a compensable injury as a result of his chemical exposure. The medical condition plaintiff is now experiencing is the direct and natural consequence of this compensable injury and his change of condition. Id.
4. As the result of his occupational disease and change of condition, plaintiff is entitled to be paid by defendant temporary total disability compensation at the rate of $376.00 per week for the following periods: 6 November and 9 November 1990; 7 January through 12 January 1991; 25 April and 29 April through 30 April 1991; 27 June 1991; 8 July through 12 July 1991; 9 September 1991; 23 October 1991; 31 October through 1 November 1991; 12 November through 13 November 1991; 8 January through 10 January 1992; 13 January 1992; 26 February through 27 February 1992; 6 March 1992; 9 March through 13 March 1992; 6 April 1992; 10 July through 24 July 1992; 27 July through 8 August 1992; and continuing thereafter accordingly through the date of this Opinion and Award and until further Order of the Commission. G.S. § 97-29.
5. As the result of his occupational disease and change of condition, plaintiff is entitled to have defendant pay for all related medical expenses incurred or to be incurred. G.S. §97-25; G.S § 97-25.1.
**********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission affirms the holding of the Deputy Commissioner and enters the following:
AWARD
1. Defendant shall pay to plaintiff temporary total disability compensation at the rate of $376.00 per week for the following periods: 6 November and 9 November 1990; 7 January through 12 January 1991; 25 April and 29 April through 30 April 1991; 27 June 1991; 8 July through 12 July 1991; 9 September 1991; 23 October 1991; 31 October through 1 November 1991; 12 November through 13 November 1991; 8 January through 10 January 1992; 13 January 1992; 26 February through 27 February 1992; 6 March 1992; 9 March through 13 March 1992; 6 April 1992; 10 July through 24 July 1992; 27 July through 8 August 1992; and continuing thereafter accordingly through the date of this Opinion and Award and until further Order of the Commission. The amount of compensation having accrued shall be paid to plaintiff in a lump sum. This compensation is subject to the attorney's fee hereinafter provided.
2. Defendant shall pay all medical expenses incurred, or to be incurred, by plaintiff as a result of his occupational disease and change of condition.
3. A reasonable attorney's fee in the amount of twenty-five percent (25%) of compensation awarded to plaintiff above is approved for plaintiff's counsel. From the amount of compensation having accrued, this fee shall be deducted from that amount and paid directly to counsel for plaintiff, with counsel for plaintiff receiving every fourth check payable to plaintiff thereafter.
4. Defendant shall bear the costs.
 S/ ______________ CHRISTOPHER SCOTT COMMISSIONER
CONCURRING:
S/ ______________ THOMAS J. BOLCH COMMISSIONER
S/ ______________ DIANNE C. SELLERS COMMISSIONER